Postal Service, United States Postal Service, United States Postal Service, United States Postal Service, Mr. Miller. Good morning. May it please the Court, Adam Miller for the appellant, RQ Squared. At the outset of this case, the Court of Federal Claims determined that RQ Squared's complaint stated a claim, but barely. In the blue brief at pages 33 to 49, you attempt to identify a genuine issue of material fact. Yes, Your Honor. When I looked at the record, your citations are all to a proposed statement of facts. Well, we submitted a statement of facts in opposition to the government's motion for summary judgment, and I would think that's what we are referring to, if I could take a look. Your Honor, I believe that the answer is that we are referring to our statement of facts that we did submit in opposition to the government's summary judgment motion. I can pull up the appendix. Well, you can look. Sure, it is a proposed statement. And my question is, are we expected to, number one, are we expected to rely on those statements of fact as a basis to say there was a genuine issue of material fact? And number two, do you expect us to sift through that proposed statement to determine which facts are disputed and which aren't? In answer to your first question, Your Honor, I believe the statement of facts cites specific evidence. And so, yes, you should rely on the evidence we've cited. And no, of course, we do not expect you, the court, to sift through the entire thing. I believe we've identified certain facts that we think give rise to genuine issues requiring trial. Go ahead. Okay. Thank you, Your Honor. At the outset of the case, the court said that the dispositive issue, her words, were whether UPS already possessed the concept and technology for its dual-label system that became flexible access before RQ2 allegedly shared its concept and technology with the Postal Service. And we've referred to this issue as a shorthand, as the novelty issue. And after allowing RQ2 very limited discovery on the novelty issue, the court granted the government's motion for summary judgment on two grounds. First, the court held that there were no genuine issues of material fact on the novelty issue. But in doing so, and as Your Honor has anticipated our argument, the court failed to draw the inferences and construe the facts in RQ2's favor. The court also refused RQ2's request for very limited specific additional discovery under Rule 56D. We wanted to take three additional depositions of individuals who had worked both on the Postal Service. Just three. With that, how would that testimony, had you been able to have it, relate to the novelty issue? Well, Your Honor, what that testimony may have shown is individuals who were involved in both projects would have been forced to explain how information got from one project to the other. And if it did so. And that's really the issue that's in dispute. But if UPS, in the novelty issue, had developed the technology on its own in advance of any of such discussions, then how would it relate to the novelty issue? If UPS had developed the technology on its own in advance, then that testimony wouldn't be necessary. But I thought that's what the fact was. I thought that that's what the court below concluded. That is what the court below concluded, and we believe that the court did so in error. That the court failed to construe certain facts in our favor. The main reason why the court concluded that UPS had developed the technology in advance is because it had a prior program referred to as UPS Basic, which, like flexible access, involved a so-called dual label. In other words, a shipping label that had barcodes for UPS and the Postal Service. But the similarities between these two programs were very superficial. UPS Basic was just that. It was basic. It was a bulk drop-off program where UPS could tender a bulk shipment of packages, or I should say a number of packages at once, to the Postal Service for delivery to certain rural areas. That program did not allow for real-time tracking of the packages in both companies' systems. It did not allow customers to choose whether to initiate a shipment with UPS or the Postal Service, which is really the most valuable part of our Q-Squared's invention. And it also didn't focus, and referring to Basic, didn't focus on a very specialized shipping market, which is the market for shipping products back to retailers. Flexible access— Just to be clear, you're not saying that the software was copied. Is that right? Well— You're talking about the broader view of the steps and the procedures. That's correct, Your Honor. What we are saying happened here is our Q-Squared developed a concept for a shipping program that would enable these features that flexible access wound up offering to customers, the Postal Service, and then our Q-Squared worked with Federal Express and the Postal Service to develop this concept, bring it from the drawing board to something that was ready for launch. And in the course of that effort, which took place over approximately two years, they figured out how to make this work. They figured out how to solve all the problems, to make the company's systems—and these are competitors—interact with each other. Well, what do you mean by figured out how to solve the problems? The problems of programming or the conceptual problems? Well, I think it's everything. It's everything to bring the program from an idea that was hatched on a blackboard into reality. And so, to be frank, Your Honor, there isn't a lot in the record below about this process because the court limited our discovery and asked us to focus on— It's your process, though, right? It's your client's process that you're talking about? Yes. Why did you need discovery on your client's process? Well, it's a fair question, Your Honor. I think that to some degree, this was more than ten years ago, and our Q-Squared, my That's not to say we have no information. We do, and we submitted— Why would the government have your information? I mean, I understand what your claim is, but you're saying you've—anyway, continue to answer the question. I'm sorry for interrupting. I'm sorry, Your Honor. So, anyways, this happened a long time ago. Information has been lost. We do have some information, and we cited information in declarations in opposition to the government's motion for summary judgment. Our claim on this point was simply that there is undoubtedly more out there. The Postal Service ought to have it, to the extent it was done in collaboration, and we ought to have been given a chance to discover it. Let me take you back to my initial question. Yes, Your Honor. I'm going to give you a specific place, okay? Footnote 19 on page 40, okay? Are you in our brief, Your Honor? Yes, the blue brief. Okay. And you say in the second clause, the third clause of that sentence, Ms. Shepard West could not testify as to who, if anyone, hatched the idea of dual entry. Yes. See appendix 1302, statement of fact number 52. So turn to 1302. Okay. Yes, Your Honor. And you want paragraph 52. Yes, and I see that we have an error because paragraph 52. You have lots of errors, but that's one example. So turn to 1304 and go to paragraph 52. Yes, Your Honor. And that takes me to the Shepard West deposition, 308 to 309, okay? But I did a lot of scrutinizing in order to find that. It's in the appendix at 1468, 1469. Now, remember, you're citing it for the proposition that she could not testify as to who hatched the idea, as you put it, okay? So we go to that, and the question is, do you recall any particular spark that led to the idea? And the answer is, the product development process is iterative. It's difficult to pinpoint it to a time and place or a specific person. Where does she say she couldn't recall who hatched the idea? Well, Your Honor, I think if you look at the top of 1468, and perhaps we ought to start at the bottom of 1467, the question was do you remember? Maybe we should, but you didn't refer me to that. You gave me specific lines of a deposition. I see your point, Your Honor, and I apologize to the extent it was unclear. Yeah, it's more than that, because that kind of sloppiness runs all the way through everything you refer to in your proposed statement of facts. I understand, Your Honor. And given that it's a proposed statement of facts, I take you back to my initial question, which is how the heck can we possibly rely on it? Well, Your Honor, all I can do at this point is refer you to the testimony on the prior page where the question was who came up with the idea. That doesn't – no, no, no, no, no, no. But she says it's a team. She does. I don't recall who came up with the idea. It's a team that works on these things. Right, and our point, Your Honor, was that this was a very lucrative and successful program that was unlike anything that came before UPS. You're not answering my question. I'm sorry, Your Honor. Don't take me to the top of the page. Tell me how on earth we as an appellate court can take this thing and rely upon it. I don't mean these pages. I mean your references to the proposed statement of facts, which is rife with mistakes. And as I said to you, do you expect us to scrutinize the entire record? Because I did a bunch. And every time I did, I found an error. Well, Your Honor, I don't know what I can say other than to the extent there are errors that you have my apologies. And, you know, we did our best to identify the information that was relevant and to specify it. And to the extent we fell short, that's my responsibility, and I apologize to the court. I do not expect you to go through the entire record. I expect you to look at the things we cited, and to the extent we cited things that are not on point, then there's nothing more you can do. Perhaps, yes. It appears that way. But, Your Honor, the reason, going back to Judge Stoll's question, the reason that we focused on this point was that this was a very lucrative and profitable new program, unlike anything that had come before. It was the first thing UPS touted in their annual report the year after it was launched. And our point was, this was such a big deal for UPS, that if UPS really came up with it, you would think that somebody would be able to raise their hand and say, yeah, we had the idea, I had the idea, this is how it happened. But they didn't have any information like that. It was all very vague. It was a team, and we don't really remember. And we just didn't think that that made sense, given the success of this program, Flexible Access, for UPS. And so we think that suggests that UPS really didn't come up with it. And I would like to direct the Court to, there was a presentation, and this is at appendix page 1738. It's a two-page presentation. It's the initial kickoff meeting between UPS and the Postal Service in May of 2008. And in this meeting, according to the notes we have that were produced by UPS, on page two it states that the Postal Service expressed interest in UPS using postal channels for drop-off acceptance points. Now, that is evidence that particularly when construed in the light most favorable to RQ squared, suggests that it was not UPS who came up with the genesis of this idea for Flexible Access. Because remember, the key to Flexible Access. How does it suggest that? Well, because it suggests that the Postal Service, or it doesn't suggest, it says that, let me get the exact words. The idea is the entry of two addresses on the same form. Is that not correct? Not quite, Your Honor. The key to Flexible Access is that a customer with a shipment that they want to send back to a merchant has the option of entering that shipment either through the Postal Service, in other words, put it in your mailbox, or UPS, in other words, take it to a UPS location. UPS has a better network for these kind of returns. But the Postal Service has more access points. Speaking hypothetically, if UPS had already designed that system, then the Postal Service's statement that it would really like to do that thing doesn't necessarily point to anything, does it? Well, that's correct, but UPS had not already designed that system, especially when construing the facts in the light most favorable to RQ squared. There's no evidence of that. This was a brand new project that they were undertaking at this time. This document is either the first or second meeting. I believe it's the first meeting between UPS and the Postal Service to launch this project. And so viewed in the light most favorable to RQ squared, this suggests that it was not UPS who came up with the idea for Flexible Access and certainly did not have the idea already in the hopper. This was the Postal Service who came up with this idea, proposed it to UPS, and did so based on the information that the Postal Service had obtained in the course of working with RQ squared on its project, which had been terminated less than two years earlier. What about the finding on page, I just want to know how what you just said relates to the finding in the court's opinion on page A2119, that there's no dispute that UPS possessed and deployed dual barcode mailing label technology at least by 2004 before RQ2 allegedly disclosed dual label concepts and technology to the Postal Service? Yes, Your Honor, there is no dispute that they had a dual label, and that was the UPS BASIC program that I referred to a few moments ago. But the label is only a very small part of the overall program. The BASIC shipping program was vastly different from Flexible Access. Flexible Access, as I mentioned, had all kinds of capabilities that BASIC did not have. I see that my time is up, may I conclude? Flexible Access had all kinds of capabilities that BASIC did not have, and we submitted an expert declaration, which was unrebutted, attesting to those. We also identified many of those in our brief. And so the mere fact that there was a dual label, meaning a label with barcodes for both entities, is only a very small part of the story. A rotary phone and an iPhone are both phones, but they're very, very different, and that's the kind of thing we're talking about here. Okay, thank you. Thank you, Your Honor. We'll show you rebuttal time, Mr. Moore. Thank you, Your Honor. Mr. Kerr. Thank you, Your Honor. May it please the Court. The Court of Federal Claims discovery schedule shows that RQ2 was allowed the discovery it needed to explore its claim. The Court of Federal Claims allowed discovery on the technology UPS relied upon developing the Flexible Access program, the nature of any materials and information provided by the Postal Service in the development of Flexible Access, and the personnel at UPS and the Postal Service who dealt with one another in developing Flexible Access program. This discovery went way beyond the novelty issue as RQ2 describes it. If there had been evidence of any proprietary information that the Postal Service gave to UPS, it would fall within the scope of this discovery that the Court of Federal Claims allowed. RQ2's discovery requests show that it took advantage of this opportunity to explore its claim. For example, in its first round of document requests, RQ2 asked for all communications between the Postal Service and UPS relating to the potential collaboration, and defendant's response to that request is defendant. Defendant interprets this request as requesting documents extending back to 2003. So RQ2's assertion that they didn't get discovery of the supposed conversations and discussions in 2006 is simply not supported by the record. RQ2 also asked for all documents relating to the development of the Flexible Access program, and notably, all documents related to the process by which the label for Flexible Access program was developed. Again, if the Postal Service transferred RQ2's proprietary information to use in Flexible Access, it would have fallen under this discovery. It was therefore not unfair for the Court of Federal Claims to conclude that the United States has shown that there was no genuine issues of material fact on the issue of whether the Postal Service took the dual-label or dual-entry idea and technology from RQ2 and gave it to UPS. The evidence shows that UPS, not the Postal Service, proposed the dual-label and the dual-entry, and I believe I heard opposing counsel say that their proprietary information is not the software, which today's the first time they've made that admission. Up until this point, it's all been about the dual-label or the technology behind the dual-label. RQ2's attempts to show a genuine issue of material fact do not contradict this evidence. For example, there's no evidence that the UPS and the Postal Service began talking about Flexible Access in 2006. There's no evidence that John Gullo or Kristen Farnaso were meaningfully involved in the development of Flexible Access. And I want to emphasize there is no evidence in the record that the Postal Service proposed dual-labels or dual-entry to UPS for Flexible Access. You say in the red brief that the Postal Service proposed single-entry and that the UPS came back with dual-entry and so found the court. What evidence supports that? There are lots of documents that support that, Your Honor. There's a June 5, 2008 presentation from the Postal Service. It's a PowerPoint. What's the site? It's at Appendix 779. Okay. Let me pull that up as well. Appendix 779 is a PowerPoint. It's called the Introductory Meeting with UPS, June 5, 2008. Right. And in this PowerPoint, for example, at 782, it shows the return service and it originates at the Post Office, the Postal. And each one, there are different versions, but each one originates only at the Post Office. Other evidence is the memo counsel for RQ2 was referring to at 767. That's the UPS memo from May of 2008 in which it says the Postal Service proposed UPS using postal service channels. Where is that? I'm sorry. That's at 767 in the appendix. That's the first page. That's the first page. But where is it specifically? I'm sorry. On 769, there's a bullet point and then the sub-bullet point. The Postal Service expressed interest in UPS using postal channels for drop-off acceptance points. UPS customers would enter their UPS packages at any postal channel, which is a post office or mailbox. The Postal Service would scan the package and let UPS know to pick it up. That is not dual entry. That is single entry at Post Office, Postal Service channels only. And during this time frame, UPS is internally discussing leveraging the basic technology. That is the dual barcode label and the systems behind it for using for flexible access. And these are internal UPS documents, and they're found at 774 and 778 in the same May-June time frame where the Postal Service is proposing using single entry, single label. And just so I don't miss it, I'll point to the court to 786 where the single label is proposed. And in July of 2008, based on its internal discussions, UPS proposed using the dual label, and this is what allowed the dual entry. Because now both the Postal Service and UPS could use the label for entry of packages. And then in September of 2008, documents should... I apologize, what's the site for that last statement? This 2008, July 2008, it's at 798 in the appendix. And that's the exhibit. And then the dual label is at 800 and 801. In September of 2008, a document shows that UPS, not the Postal Service, is considering UPS and Postal Service access points, which is dual entry. And that's at 813 in the appendix. And that, I believe, is a... Oh, it more than answers the question. Pardon me, your name? It more than answers the question. Oh, good, okay. And so I'll wrap that up. There's not a scintilla of evidence that the Postal Service proposed dual labels or dual entry. With regard to the Court of Federal Claims' use of 56D, in both its oppositions to our original summary judgment motion and the opposition to our renewed summary judgment motion, RQ2 requested the targeted discovery that it now is disputing in this court. It did not argue that the standards of Rule 26 should apply to 56D discovery, and therefore it weighed this argument below. In fact, it even objected to our request to expand a discovery to include the identification of the proprietary information that RQ2's claim was based on. So RQ2 said this was outside of the scope of the Rule 56D discovery, and therefore they cannot now argue to this court that the... Where's that? That's in the court's discovery order. In the record. Yeah, it's in the record on the court's discovery order that March... I believe it's March 30th. March 30th order at the appendix at 628. 628. And 629 is where the court rejects our request for the very discovery that RQ2 now claims that they were deprived of below. Finally, there's no evidence that the Postal Service failed to retain or produce pre-2002 documents. I'm sorry, pre-2009 documents. And the best evidence that it didn't is the well-developed record of documents from 2008, which was the time period of the development of the Flexible Access Program. This record shows that there are no genuine issues of material fact, and therefore we ask the court to affirm the Court of Federal Claims judgment. Any more questions? No, thank you. No questions? Thank you, Mr. Kerr. Mr. Miller. Thank you, Your Honor. Just briefly, the document I referred to earlier and which Mr. Kerr referred to was in May of 2008, and that is the document which refers to UPS customers entering their UPS package in postal channels. That is dual entry because obviously a UPS package can be entered into a UPS channel. This, for the first time, would enable a customer to enter a UPS package in a postal channel. That didn't exist before. Did the USPS envision anything other than they were getting all the business? Well, I don't know exactly what the USPS envisioned, Your Honor. We weren't allowed to question anybody from the Postal Service. In fact, we identified two individuals. Didn't you depose some folks from the Postal Service? I'm sorry, Your Honor? Isn't there a deposition of somebody? We were only allowed to take one deposition, and that was a woman who worked for UPS. No Postal Service employees. And, in fact, we identified three Postal Service employees who worked on both the project with RQ2 and the project with UPS, and we said in our 56D request we'd like to depose these three people, and candidly there's two of them who are of primary importance, both of whom were at this May of 2008 meeting, which was the first meeting, Mr. Gullo and Mr. Cochran, and we weren't allowed to take that discovery. And so, you know, to really fully answer Your Honor's question, I think I would need to be able to depose these folks. And that's what we had asked for. And so our request – I'm sorry, Your Honor? It seems to me that the documents were sort of race-interlocked with her. Well, you know what? Okay. We don't see it that way. We think that this clearly indicates that the Postal Service was the one who first proposed dual entry. And yes, the documents that follow this one, which counsel referred to, do show UPS developing flexible access from that point. But what we'd like to know is from Mr. Gullo and Mr. Cochran, the people who worked on both of these projects and were present when this idea was proposed in May of 2008, what did you say? What information did you rely on? What further conversations did you have with UPS over the following months as they developed their flexible access program? Because that would really get to the true facts about what happened, how this information moved from the RQ2 project to the UPS project, if it did. But we haven't been able to discover that because the court limited our discovery and denied our Rule 56D request. So that's the essence of our claim. Okay. Anything else? Thank you, Your Honor. Thank you. Thank you both. The case is taken under submission. And that concludes our argument cases for this morning. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m.